COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS





STACEY MONTGOMERY,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 

No. 08-02-00372-CR



Appeal from the


383rd Judicial District Court


of El Paso County, Texas 


(TC# 20020D00047)




M E M O R A N D U M O P I N I O N


 Appellant appeals her conviction for criminally negligent homicide. Appellant was
charged with intoxicated manslaughter and manslaughter but found guilty by a jury of the
lesser-included offense of criminally negligent homicide. The judge sentenced her to eight
(8) years in the Texas Department of Criminal Justice. We affirm the judgment of the trial
court.

I. FACTUAL SUMMARY

 On August 27, 2000, MiChele Danette Williams was at Allen's Lounge with Rita
Suzanne Young ("Susie") near the intersection of McCombs and Sun Valley in El Paso. 
Donna Gale and Charlotte Clark were also at Allen's that evening. MiChele knew Appellant
and saw her at Allen's between 10 p.m. to 10:30 p.m. that evening. MiChele saw Appellant
drink one and a half beers and had about the same herself. MiChele heard Appellant state
that she had been bar hopping and had come from the Iron Horse Lounge. However, Donna
testified that Appellant told her she had just come from the Greek food festival. MiChele
stated that Allen's was the only bar she had been to that night and that she was not
intoxicated. To the contrary, Susie testified that she and MiChele had been at Allen's all day
long and that MiChele had been drinking a bottle of Bacardi Gold, not 151, and Michelob
since 11:30 a.m and that the rum was gone at the end of the night. MiChele testified that she
had worked as a medical specialist in the Army for about five years and that she was familiar
with the characteristics of persons under the influence of drugs or alcohol. MiChele
described Appellant as talking loudly that evening and going from customer to customer in
rapid succession and gesturing. MiChele felt that Appellant was acting consistent with
cocaine intoxication. MiChele retired from the Army due to surgery which severed her right
perennial nerve causing her to limp and requiring the use of a brace. 

 Susie did not believe that Appellant was intoxicated but that she was hyper and
described her as "coked up." Donna did not believe that Appellant was intoxicated or under
the influence of drugs. In fact, Donna described Appellant as bubbly and energetic that
evening, like her normal self. Charlotte also believed that Appellant was sober and not under
the influence of drugs. But, Donna and Charlotte did believe that MiChele was intoxicated. 
(Further, Donna and Charlotte saw a bottle of 151 on MiChele's table at the bar. Both Donna
and Charlotte insisted that MiChele had parked her van in front of the door at the lounge that
night. 

 When Appellant approached MiChele's table, MiChele got up and left and went
outside to her van, which was parked behind the 7-Eleven next door. Susie also testified that
MiChele probably parked behind the 7-Eleven. However, Susie testified that Appellant
joined her and MiChele at the table and that MiChele did not get up and leave. Donna did
not see MiChele leave; however Charlotte did. In addition, MiChele denied that her van was
parked in front of the Lounge's door. MiChele did not see Appellant leave Allen's. 
MiChele's van was parked close to the street, and she had a clear view of the Sun Valley 
McCombs intersection. At this time, Marjorie Ramos was sitting in the car in front of the
7-Eleven waiting for her husband. Marjorie saw Appellant enter the store and get in her car
and leave. 

 MiChele saw a motorcycle with lights on crossing McCombs and going east on Sun
Valley heading MiChele's direction with a green light. There was a substantial dip in the
road at the intersection, and MiChele did not believe that the motorcycle driver was speeding
since she did not hear a thunderous roar. Further, the motorcycle driver was not driving
erratically. Marjorie also saw the motorcycle from a side profile; she also did not believe that
the motorcycle was speeding. 

 Appellant's car was coming out of the second 7-Eleven exit. MiChele was not sure
if Appellant made a compete stop but noticed that Appellant failed to look the other
direction. Appellant pulled out and traveled east on Sun Valley crossing two lanes of
westbound traffic and failed to yield the right of way pulling out in front of the motorcycle. 
Appellant's car was not completely in the lane. Then, the motorcycle slammed into the back
of Appellant's car. MiChele saw the motorcycle driver flip over the bike and hit the ground
while the bike slid down the street. Marjorie did not see the accident but heard the impact. 
MiChele ran toward the vehicles, but the car kept going down the road. It was when the
driver looked over her shoulder that MiChele realized it was Appellant. MiChele was calling
for Appellant to stop, which she finally did. Marjorie did not notice if MiChele was yelling
for Appellant to stop or chasing her car. Marjorie went over to the body where she took the
driver's pulse; MiChele met her there shortly after. MiChele also felt for a pulse and got
blood on her hands. The motorcycle driver was later identified as David Molina. Neither
MiChele nor Marjorie smelled alcohol on the motorcycle driver. Marjorie did not believe
that MiChele was intoxicated. 

 Appellant got out of her car and walked back to the scene and asked what happened. 
Appellant stated that the motorcycle rear-ended her. Then, Appellant sat on curb and waited
for the police. Marjorie described Appellant as nervous and panicky. MiChele's friend
called 911, and the fire department, ambulance, and police arrived. MiChele spoke with the
police but did not give a written statement. Further, MiChele insisted that she saw the
accident and did not walk out of the bar only after hearing the accident. 

 Susie testified that she heard the crash approximately thirty to forty-five minutes after
Appellant left the bar and that MiChele was sitting with her at a table, not outside witnessing
the accident. Further, Susie stated that it was her who took the decedent's pulse, not
MiChele. Susie went back inside the lounge after EMS arrived. Donna went outside because
someone came into the bar and said that there was an accident outside. Charlotte testified
that MiChele had already left Allen's when someone came in about the accident. Donna
testified that MiChele stated that she did not know what happened and that she came over
when she heard the crash and realized that Appellant had hit someone and killed him. 
MiChele never told Donna that she saw the accident and Donna stated that MiChele was
confused about what was going on. 

 Officer Wesley Hauk and his partner Officer Rose Smith arrived at the scene shortly
after 11 p.m. Hauk saw the motorcycle driver on the asphalt and Appellant sitting on the
curb. Officer Smith secured the scene. Hauk first spoke to the Appellant to get her side of
the story. Appellant was hysterical, depressed, and moody. One minute she was calm and
normal, then the next she was speaking rapidly and crying. Appellant told Hauk that she had
been at Allen's where she had a couple of beers slowly and then went to the 7-Eleven. When
leaving the 7-Eleven, she looked both ways, turned left onto Sun Valley going east, and the
bike struck her. 

 Next, Hauk spoke with the bartender at Allen's and two witnesses--one Hispanic and
one black-- who saw the accident. Hauk believed the two witnesses were competent and did
not feel that either was intoxicated. While Hauk spoke with others, he did not feel that they
were credible witnesses. Appellant was placed in the squad car for her protection. Hauk
stated that a driver leaving private property has to yield right of way to vehicles on a public
access road. Hauk believed that Appellant was on something, but no sobriety tests were
given. The police report stated that the decedent's intoxication was a factor contributing to
the accident. Further, the report cited Appellant's failure to yield the right of way and her
being under the influence of alcohol as contributing to the accident. 

 Hauk stayed at the scene until the motorcycle driver was taken away, then Appellant
was arrested for intoxication manslaughter and taken to the Mission Valley substation to give
a breath sample. Appellant blew a .077 and a .073. Hauk was then instructed to take
Appellant to Thomason Hospital to give a blood sample. The testing of Appellant's blood
resulted in a .64 milligrams per liter concentration of benzoylecgonine, a cocaine metabolite. 
Further, there were slight indications of cocaine. However, the Texas Departement of Public
Safety ("TDPS") crime lab was unable to determine what amount of cocaine was in
Appellant's system at the time of the accident. After the sample was taken, Appellant was
transported to jail. 

 Officer Ricky Hoss was called out to the scene around 11 p.m. and arrived at 11:30
p.m.. Upon his arrival with his partner Officer Jesse Eckerd, the drivers had been removed
and only the vehicles remained. The officers then diagramed the scene. No skid marks were
found, only gouge marks. Further, the speed of the vehicles could not be determined. 
However, Hoss stated that due to the dip in the road, the motorcycle driver could not have
been excessively speeding or he would have probably lost control or bottomed out. Upon
examining Appellant's car, Hoss found damage to the back right and to the left side and top. 
The motorcycle contacted the car at the back right then the body came up to the top of the
hood and rolled off to the side. Upon examining the motorcycle, Hoss found it had low
ground clearance, so the driver would have had to be more careful than drivers of other bikes. 
Further, there were gouge marks on the frame going sideways and white paint on the front
tire. Officer Miguel Chavez inventoried and impounded Appellant's car. An unopened
twelve-pack of beer was found on the backseat. Further, Chavez found a bottle vial behind
the front passenger seat in front of the rear floor mat containing a substance which tested
positive as cocaine. 

 Dr. Juan Contin, El Paso County Medical Examiner, performed the autopsy on the
decedent. Dr. Contin noted abrasions and scratches on decedent's forehead, nose, and upper
lip. Further, he suffered a hemorrhage in the right occipital area of his brain, a diffused
subarachnoid hemorrhage, laceration of his right cerebellum lobe, contusions on his
cerebellum lobe and the cortex of the brain, a fracture of the right occipital bone, and a thick
collection of blood on the surface of the brain. Contin testified that decedent was intoxicated
at the time of the accident with a blood alcohol level of .238, which would make it difficult
to operate an automobile. Further, a patron of the Iron Horse Saloon testified that he saw the
decedent there that evening around 6 p.m. and that he was served at least two beers and left
between 8 p.m. and 9 p.m.. The examiner noted that the decedent may not have sustained
such injuries had been wearing a helmet. Last, Contin noted that at a blood alcohol
concentration of .30, it was possible for people to pass out. The cause of decedent's death
was head injury sustained in a motor vehicle/motorcycle accident. 

 Harry E. Kirk, a private investigator hired by the defense, testified that it took an
average of seven seconds to cross the two westbound lanes and enter the eastbound lane of
traffic. Using a four second interval, he determined that if a person was going 30 mph, the
vehicle's brakes were working, and the driver was attentive to his driving, then he should
have stopped short of the collision point. Kirk concluded that the accident occurred because
the motorcycle driver did not react to danger due to his intoxication, which was backed up
by the lack of skid marks. 

II. DISCUSSION

A. FACTUAL INSUFFICIENCY

 In Point of Error No. One, Appellant argued that the evidence was factually
insufficient since the decedent caused his own death. Appellant asserted that the decedent's
death was the sole result of the decedent's own acts and omissions. 

1. Standard of Review

 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), cert. denied, 522 U.S.
832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A defendant challenging the factual sufficiency
of the evidence may allege that the evidence is so weak as to be clearly wrong and manifestly
unjust, or in a case where the defendant has offered contrary evidence, he may argue that the
finding of guilt is against the great weight and preponderance of the evidence. See Johnson,
23 S.W.3d at 11. Although we are authorized to set aside the fact finder's determination
under either of these two circumstances, our review must employ appropriate deference and
should not intrude upon the fact finder's role as the sole judge of the weight and credibility
given to any evidence presented at trial. Id. at 7. We are not free to reweigh the evidence
and set aside a verdict merely because we feel that a different result is more reasonable. Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d at 135.

2. Criminally Negligent Homicide & Concurrent Causation

 Criminally negligent homicide involves causing the death of another by criminal
negligence. Tex. Pen. Code Ann. § 19.05(a) (Vernon 2003). Criminal negligence requires
a lesser culpable mental state than recklessness. Tex. Pen. Code Ann. § 6.03(c), (d) (Vernon
2003); see Conroy v. State, 843 S.W.2d 67, 71 (Tex. App.-- Houston [1st Dist.] 1992, pet.
ref'd). Criminal negligence involves inattentive risk creation; the actor ought to be aware
of the risk surrounding his conduct or the results thereof. Lugo v. State, 667 S.W.2d 144,
147-48 (Tex. Crim. App. 1984); Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim. App.
1975); Todd v. State, 911 S.W.2d 807, 814 (Tex. App.--El Paso, 1995 no pet.). 

 A person is criminally responsible if the result would not have occurred but for his
conduct, operating either alone or concurrently with another cause, unless the concurrent
cause was clearly sufficient to produce the result and the conduct of the actor clearly
insufficient. Tex. Pen. Code § 6.04(a) (Vernon 2003). Thus, under this section, two
combinations may exist to satisfy the requisite causal connection between the Appellant's
conduct and the harm that followed: (1) the Appellant's conduct may be sufficient by itself
to have caused the harm, regardless of the existence of a concurrent cause; or (2) the
Appellant's conduct and the other cause together may be sufficient to have caused the harm. 
Robbins v. State, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); Umoja v. State, 965 S.W.2d
3, 9 (Tex. App.--Fort Worth 1997, no pet.). Section 6.04(a) also defines and limits the "but
for" causality for concurrent causes with its last phrase, "unless the concurrent cause was
clearly sufficient to produce the result and the conduct of the actor clearly insufficient." 
Robbins, 717 S.W.2d at 351; Umoja, 965 S.W.2d at 9. If the additional cause, other than the
defendant's conduct, is clearly sufficient by itself, to produce the result and the defendant's
conduct, by itself, clearly insufficient, then the defendant cannot be convicted. Id.

3. Appellant's Arguments

 Appellant argued that her conduct that evening was clearly insufficient to have caused
the decedent's death but that the decedent's acts and omissions were clearly sufficient to
have caused his death. In fact, Appellant contended that the decedent would have lived had
he not been intoxicated near the point of unconsciousness and had worn a helmet. Further,
Appellant argued that Williams's testimony that she witnessed the accident was untenable
and she failed to make a written statement and had no document from which to refresh her
memory of the accident. Next, Appellant argued that Donna and Charlotte both testified that
Williams was intoxicated that night and that she had parked her van in front of the bar, not
behind the 7-Eleven next door. In addition, the Appellant argued that the jury clearly
rejected the State's evidence trying to show she was intoxicated at the time of the accident
and that she fully cooperated with police. Last, Appellant relied on Kirk's testimony that the
primary cause of the accident was the decedent's inability to react due to his intoxication. 
Thus, Appellant asserted that the evidence was factually insufficient to support the jury's
rejection of her concurrent causation defense.

 Viewing the evidence in a neutral light, we examine Appellant's argument regarding
insufficient evidence of causation. One of two scenarios must be present for Appellant to
have been criminally responsible: (1) the Appellant's conduct may be sufficient by itself to
have caused the harm, regardless of the existence of a concurrent cause; or (2) the
Appellant's conduct and the other cause together may be sufficient to have caused the harm. 
 Id.

 Evidence tending to support Appellant's conduct being sufficient by itself is as
follows: (1) MiChele testified that she witnessed the accident and that Appellant failed to
yield the right of way; (2) Marjorie testified that while she did not see the collision that she
heard the impact and had seen Appellant leaving the 7-Eleven and the motorcycle driving by
on Sun Valley; (3) several witnesses testified that Appellant had been drinking that evening;
(4) MiChele believed that Appellant was intoxicated; (5) two witnesses described Appellant
as being under the influence of drugs; and (6) Officer Hauk believed that MiChele and
Marjorie were credible witnesses and did not believe that MiChele was intoxicated that
evening. Evidence tending to support Appellant's conduct being insufficient by itself is as
follows: (1) the motorcycle driver smelled of alcohol and had a blood alcohol level of .238;
(2) Susie testified that MiChele could not have seen the accident since she was inside the
lounge at the time of the collision; (3) Donna testified that MiChele told her she did not know
what happened and that MiChele never told her she witnessed the accident; (4) Appellant
told the officer that she was leaving the 7-Eleven and looked both ways before entering Sun
Valley; (5) several witnesses testified that MiChele was intoxicated that evening; and (6)
several witnesses testified that Appellant was not intoxicated or under the influence of drugs.

 Evidence tending to support concurrent causation is as follows: (1) the police report
noted the motorcycle driver's intoxication as a contributing factor to the accident; (2) the
report also noted Appellant's failure to yield the right of way and her being under the
influence of alcohol as contributing factors to the accident; (3) Appellant blew .077 and .073
in a breath test; (4) Appellant had a .64 milligram per liter concentration of a cocaine
metabolite in her blood and slight indications of cocaine; and (5) the medical examiner
testified that the cause of the motorcycle driver's death was head injury sustained in a motor
vehicle/motorcycle accident. Evidence tending to disprove concurrent causation is as
follows: (1) there were no skid marks at the scene; (2) the motorcycle driver had been at the
Iron Horse Saloon earlier that evening; (3) the motorcycle driver had a blood alcohol
concentration of .238, which the medical examiner testified could impair his ability to
operate a motor vehicle; (4) the medical examiner testified that a person could pass out at a
blood alcohol concentration level of .30; (5) the medical examiner admitted that had the
motorcycle driver been wearing a helmet he might not have sustained the injuries he
received; and (6) the defense's investigator testified that the cause of the accident was the
motorcycle driver's failure to react to the danger due to his intoxication. 

 In weighing the evidence noted above, we do not find the evidence supporting
Appellant's criminal responsibility to be so weak as to be clearly wrong and manifestly unjust
nor the jury's finding of guilt against the great weight and preponderance of the evidence. 
Johnson, 23 S.W.3d at 11. Our review must employ appropriate deference and should not
intrude upon the fact finder's role as the sole judge of the weight and credibility given to any
evidence presented at trial. Id. at 7. We are not free to reweigh the evidence and set aside
a verdict merely because we feel that a different result is more reasonable. Cain, 958 S.W.2d
at 407; Clewis, 922 S.W.2d at 135. Accordingly, we find that the evidence is factually
sufficient to support Appellant's conviction and overrule Point of Error No. One.

B. OPPORTUNITY TO IMPEACH AND CROSS EXAMINE

 In Point of Error No. Two, Appellant argued that she was denied her right to present
a defense since the court did not allow her to effectively impeach and cross examine witness
MiChele Williams. Appellant asserted that during the direct examination of Donna Gale,
defense counsel tried to impeach MiChele by establishing that MiChele did not actually
witness the accident. Further, Appellant complained that during Donna's testimony, defense
counsel tried to elicit statements made by MiChele to Donna just after the accident and that
the court erroneously excluded the testimony based on hearsay objections by the State. 
Appellant argued that the statements by MiChele were not hearsay.

1. Trial Testimony

 During the defense counsel's direct of Donna, the following exchange occurred:

 Q. What happened after Ms. Montgomery left the bar that evening?

 A. I was just sitting there. I was finishing my beer, and Charlotte was
playing the machine. And then someone came in, a couple of friends
of mine, said that, "What's going on outside?" And I said, "Well, I
don't know. I didn't hear anything."

 They said, "There's a fire truck going and there was an accident out
there." And that's when Rick said, "And your friend -- your friend is
out there." And the only one I knew was Stacey that was there that --
that night -- I mean, you know, that had gone."

 Q. So what did you do after that?

 A. That's when I went outside, and I came out -- I had to go around
Chele's van, and I came down here, and Chele was standing about right
here. Approximately, the motorcycle was somewhere here, and Chele
was standing there--

 Q. Okay.

 A. -- okay?

 I walked up to Chele, and I asked her what happened. And she said, "I
don't know. I heard the crash, and I came over to see. Stacy hit
somebody and killed him."

 Q. Did she state to you that she saw the accident?

 A. No, she never -- she said -- she said, "I don't know what happened. I
heard the crash, and I came over."

 Q. Are you sure of that?

 A. Yes.

 Q. She didn't tell you that she saw the accident, and she ran down the
block to stop Ms. Montgomery from driving off?

 A. No. She never -- in fact, she was just standing there, and I asked her if
-- she said, " I was" --

 State: Your Honor, I'm going to object to any hearsay. 

 Court: Sustained.

 Defense: Your Honor, for impeachment purposes. She is
contradicting the statements that Ms. Williams stated that
evening.

 Court: That's still hearsay.

 State: Yeah, there's no exception.

 Q. She never told you she saw the accident?

 A. No.

 State: Your Honor, I'm going to object to any hearsay.

 Court: Sustained.


2. Applicable Law

 A defendant has the right to present a defensive theory. Washington v. Texas, 388
U.S. 14, 18, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). "The right to offer the testimony
of witnesses, and to compel their attendance, if necessary, is in plain terms the right to
present a defense, the right to present the defendant's version of the facts as well as the
prosecution's to the jury so it may decide where the truth lies. Just as an accused has the
right to confront the prosecution's witnesses for the purpose of challenging their testimony,
he has the right to present his own witnesses to establish a defense. This right is a
fundamental element of due process of law." Id. at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1019. 
In Coleman v. State, 545 S.W.2d 831, 832 (Tex. Crim. App. 1977), the defendant was
convicted of possession of cocaine. Appellant was alleged to have intentionally possessed
an unweighable quantity of cocaine: a trace amount. Id. The record revealed that 1/280,000
of an ounce was weighable. Id. Other than the chemist's testimony and that of the witness
from the Automobile Records Department of Bell County who identified the defendant as
being the record owner of the vehicle in which he was stopped while driving, the only
evidence presented by the State was the testimony of the arresting officer. Id. On appeal,
the defendant argued that the unweighable trace amount of cocaine was planted on him by
the arresting officer, and the defendant attempted to support this defense by his own
testimony and the testimony of two other defense witnesses to the effect that members of the
Killeen Police Department severely disliked him and that this dislike began before the time
of his arrest and continued until the day of his trial. Id. The Court of Criminal Appeals
found that in depriving the defendant of the right to show the relationship and the attitude of
the Killeen Police Department toward him, the trial court erred for two reasons: (1) The
defendant had the right to impeach the arresting officer's credibility by showing him to be
a past member of a class who has been and will continue to be severely prejudiced against
appellant, and (2) the defendant had the right to support his defensive theory. Id. Thus, the
court held that in excluding the defense's proffered testimony, the trial court not only denied
appellant a defensive theory, it denied him the only defense he had. Id. 

 Further, defendants have a right to cross examine witnesses. U.S. Const. amend. VI;
Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Cross
examination serves three general purposes: (1) to identify the witness with his community
so that independent testimony may be sought and offered concerning the witness's reputation
for veracity in that community; (2) to assess the credibility of the witness; and (3) to allow
facts to be brought out tending to discredit the witness by showing that his testimony in chief
was untrue or biased. Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996), (citing
Alford v. United States, 282 U.S. 687, 691-92, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931)),
(citing Tla-Koo-Yel-Lee v. United States, 167 U.S. 274, 17 S.Ct. 855, 42 L.Ed. 166 (1897)). 

3. Application to Facts

 The State's most significant witness was MiChele, who was also the sole witness of
the accident and who stated that Appellant failed to yield the right of way. Appellant's
defense was that the motorcycle driver ran into her and failed to react to the danger due to
his intoxication. At trial, the defense cross examined MiChele during the State's case in
chief. First, the defense questioned MiChele about her ability to have run after the
Appellant's car trying to get Appellant to stop since she had suffered a leg injury and had to
use a brace. Second, the defense cross examined MiChele as to whether she parked in front
of the door of Allen's Lounge rather than behind the 7-Eleven. Third, defense counsel cross
examined MiChele regarding whether she really walked out of the lounge after the accident
occurred, rather than before as she testified on direct. The defense at no time complained
that it was denied the ability to cross examine MiChele.

 In addition, the defense was able to impeach MiChele's testimony during its case in
chief. Both Donna and Charlotte testified that MiChele had actually parked in front of the
lounge's door rather than in an adjoining parking lot. Donna testified that MiChele told her
she did not know what happened at the accident. Further, Donna testified that MiChele never
told her she witnessed the accident. Susie testified that there was no way MiChele saw the
accident since she was seated with her at a table when the accident occurred. Last, Donna
and Charlotte testified that MiChele seemed intoxicated, and Susie testified that MiChele had
been at the lounge since 11a.m. that morning and drinking since 11:30 a.m. 

 Thus, we find that Appellant was not denied her right to cross examine or impeach
MiChele. First, defense counsel had the opportunity to adequately cross examine MiChele
regarding any contradictory testimony. See Carroll, 916 S.W.2d at 497. Second, the State
did not object to the defense's direct of Donna until defense counsel asked Donna to repeat
whether MiChele ever told her see witnessed the accident. The fact that MiChele did not tell
Donna she was a witness to the accident had already been allowed into evidence. Thus,
Appellant was not denied an opportunity to present a defensive theory. See Washington, 388
U.S. at 18, 87 S.Ct. at 1923, 18 L.Ed.2d at 1019. Accordingly, Appellant's Point of Error
No. Two is overruled.




 Having overruled each of Appellant's points of error, we affirm the judgment of the
trial court.

September 10, 2004


 RICHARD BARAJAS, Chief Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)